UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANNA M. KLADIS, | ) |
| | ) Case No. 12 C 7694 |
| Plaintiff, | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner or Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Anna Kladis seeks reversal and remand of the final decision of the Commissioner of Social Security denying her application for social security benefits (doc. # 17). Ms. Kladis contends that this decision was not supported by substantial evidence. We disagree.

### I.

On February 11, 2010, Ms. Kladis filed her application for benefits, claiming that she became disabled on July 11, 2003 due to "sensitivity to all kinds of chemicals," "heart races," "lose balance," "nausea," "diarrhea," "feel like fainting," "fatigue," and "breathing problems" (R. 154). Her alleged onset date was July 11, 2003, and her date last insured was December 31, 2005 (R. 149-50).

### A.

Ms. Kladis's ailments allegedly began on March 24, 2003, when she went to the hospital complaining of diarrhea and dizziness after exposure (since February 2003) to new cleaning chemicals at her job cleaning and repairing print heads at Videojet (R. 221, 253, 312). Ms.

---

[1]On February 14, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 13). On September 13, 2013, we held that Ms. Kladis waived any reply as she did not timely file a reply or a motion seeking additional time to do so (doc. # 22).

Kladis also visited her treating physician, Dr. John Damergis, in April and May 2003, complaining of these ailments (R. 601-03). At the May visits, Ms. Kladis appeared extremely anxious and weak, and Dr. Damergis recommended that she follow up with an occupational physician (he provided her with contact information for three such physicians) to evaluate the chemicals that she worked with and her reactions to them (*Id.*). Dr. Damergis reported that her physical examination was unremarkable, and he noted that the lab results from her March hospital visit were normal (R. 602). He excused Ms. Kladis from work for the month of June (R. 588, 593).

On June 27, 2003, Ms. Kladis was evaluated by a pulmonologist, Dr. David Cugell (R. 253). Dr. Cugell reported that her physical examination was normal, and he reviewed her recent medical records which showed normal blood chemistry (except for elevated cholesterol) and normal chest x-ray (R. 254-55). Dr. Cugell opined that Ms. Kladis's symptoms and complaints supported a diagnosis of anxiety, which was not the result of any exposure to chemicals (R. 255). He indicated that Ms. Kladis could not resume her normal job due to emotional and psychological reasons, unless better ventilation at her worksite or a different work assignment could reassure Ms. Kladis that her worksite was safe (*Id.*). Dr. Cugell recommended that Ms. Kladis undergo psychological counseling (R. 256).

Ms. Kladis visited the hospital again on July 9, 2003, after feeling weak, off-balance, and having diarrhea, which she attributed to her exposure to the cleaning chemicals at work (R. 264). However, a diagnostic work-up, including blood tests and a CT scan of the head, were normal (R. 266). The hospital treating physician, Dr. Jeanne Johnston, observed that Ms. Kladis appeared "extremely anxious," and she recommended that Ms. Kladis get fresh air, rest, and

2

follow up with an occupational health clinic (R. 265-66). On July 11, 2003, Ms. Kladis briefly returned to work, only to stop working due to dizziness and nausea (R. 12, 281).

The next medical report in the record is dated more than four years later, in August 2007, when Ms. Kladis visited Dr. Damergis for a general medical examination (R. 409). Dr. Damergis scheduled Ms. Kladis for pulmonary function testing due to her concern about "lung residual from previous inhalation issues" (*Id.*). That testing, and additional laboratory testing, was normal except for high cholesterol (R. 406, 412, 435-36). Dr. Damergis noted that Ms. Kladis was experiencing "[s]ituational stress" associated with an impending divorce, but he offered no opinion that she had mental health problems that required treatment (R. 414). Ms. Kladis visited Dr. Damergis several times during the remainder of 2007 for unrelated issues and screenings (R. 417-24)

The medical record next skips to a March 25, 2010, medical evaluation that Vidya Madala, MD, completed for the Department of Disability Services ("DDS"). Without examining Ms. Kladis, Dr. Madala determined that there was insufficient evidence that she was disabled between her alleged onset date and her date last insured (R. 444-46); on May 11, 2010, Reynaldo Gotanco, MD, affirmed the decision on reconsideration (R. 488-90).

In May 2010, Ms. Kladis began visiting a host of physicians. On May 3, 2010, she visited an allergist, Dr. Jeffrey Kulik (R. 448-50). Dr. Kulik suspected that she had chemical intolerances, but the only treatment was avoidance of the chemicals (R. 450). Based on her symptoms, Dr. Kulik opined that her problem was mostly neurological, and he recommended that she see a neurologist and possibly a psychiatrist (*Id.*).

On May 27, 2010, non-examining DDS consultant Terry Travis, MD, completed a psychiatric review technique for Ms. Kladis based on the medical record. He found insufficient

3

evidence prior to that date to determine if she had a medically determinable impairment (R. 295). Dr. Travis also noted that Ms. Kladis's activities of daily living ("ADLs") did not reveal any significant limitations due to depression (R. 307).

On June 11, 2010, Ms. Kladis returned to Dr. Damergis, complaining of achiness and weakness (R. 500-01). That marked Ms. Kladis's first visit to Dr. Damergis since late 2007. Dr. Damergis opined that most of her symptoms stemmed from anxiety, and he diagnosed her with anxiety disorder (R. 502). He also referred her to a psychiatrist and pulmonary specialist (*Id.*).

On June 14, 2010, Ms. Kladis had a pulmonary evaluation done by Dr. Ahmad Raslan (R. 492). Dr. Raslan found that her physical examination and pulmonary function test were "completely normal" and that her "symptoms are more suggestive for anxiety disorder" (R. 493, 495). Ms. Kladis visited Dr. Raslan again on July 2, 2010, complaining of dyspnea and allergic reactions from exposure to chemicals, but her examination and test results were normal, and Dr. Raslan had no other pulmonary recommendation other than to avoid exposure to chemicals (R. 496-98).

On July 7, 2010, Ms. Kladis visited Dr. Damergis again complaining of "high sensitivity to chemicals" (R. 503). He noted that she was "in denial" and needed to have a neuropsychiatric evaluation (R. 504). On July 28, 2010, Dr. Damergis wrote a letter opining that Ms. Kladis could not sustain gainful employment because she suffers from severe dyspnea, anxiety, and severe allergy to multiple chemicals, and he did not believe her condition would improve (R. 520). She again visited Dr. Damergis's office in August 2010, complaining of anxious, fearful thoughts and depressed mood (R. 511).

Ms. Kladis finally underwent a psychiatric evaluation in December 2010. At her two visits that month, she reported having a chemical imbalance and multiple chemical sensitivities,

4

trouble sleeping, and headache and neck pains (R. 633-34, 636). The examiner observed that Ms. Kladis appeared depressed and anxious, with a constricted affect, loose thought process and distractibility (R. 636-38). Ms. Kladis disagreed with all treatment and medication recommendations (R. 634).

**B.**

On January 7, 2011, Ms. Kladis, represented by counsel, appeared at a hearing before an Administrative Law Judge ("ALJ"). She testified that she became sick in July 2003 from "viper [*sic*] carbons and toxic gas" (R. 28). Ms. Kladis testified that she did not follow up with Dr. Damergis after she left her job in 2003, because her employer did not believe that doctor's assessment (R. 32). Instead, she saw Dr. Johnston, but Dr. Johnston found nothing wrong with her and recommended she go to an occupational clinic (*Id.*).

Ms. Kladis has lived alone since her divorce in October 2008 (R. 33). She takes care of her house, including occasionally shoveling, mowing the lawn, and driving to the grocery store, so long as the fumes in the grocery store do not bother her (R. 34). Ms. Kladis testified that she has reactions at least once a week to chemicals from traffic, fertilizer, cleaning products, copy machines, markets, and her vacuum cleaner (R. 30, 38). The reactions sometimes cause her depression, insomnia, anxiety, high blood pressure, panic attacks, and occasional burning pain in her knees and shoulder, and she has to lie down (R. 30-31). However, she does not take medication because she fears the possible side effects (*Id.*).

The medical expert ("ME"), Dr. James McKenna, testified that Ms. Kladis's complaints appear to stem from anxiety rather than exposure to chemicals, because emotional factors

5

appeared prominently her doctors' notes and her refusal to take medication, and she has had consistently normal physical tests results (R. 40-41, 43, 46).[2]

## C.

On March 23, 2011, the ALJ denied Ms. Kladis's claim at Step Two of the Social Security Administration's five step sequential process for determining whether an individual is disabled. The ALJ found that "there [we]re no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment through the date last insured" (R. 15).

The ALJ reviewed Ms. Kladis's complaints and the medical record beginning in the spring of 2003, when Ms. Kladis claimed that she started suffering joint pain, dizziness, weakness, and breathing trouble, among other symptoms, due to her exposure to chemicals at work (R. 14). At the time, she complained of these symptoms to a hospital physician and her treating physician, Dr. Damergis, but although she appeared anxious, her diagnostic testing and physical examinations were normal (*Id.*). Dr. Damergis and the hospital physician, Dr. Johnston, recommended a consultation with an occupational physician for an evaluation of Ms. Kladis's reaction to chemicals (*Id.*). The ALJ also noted that in June 2003, Ms. Kladis was evaluated by a pulmonologist, Dr. Cugell, who found normal vital signs and pulmonary function (*Id.*). Dr. Cugell opined that Ms. Kladis's complaints were not caused by exposure to chemicals, but rather supported a diagnosis of anxiety and emotional issues, and he recommended a psychological consultation (*Id.*).

Despite these physician recommendations, Ms. Kladis did not seek treatment from an occupational physician or a mental health professional, and she did not take any recommended

---

[2] The ALJ agreed to Ms. Kladis's attorney's request to leave the record open so he could submit additional psychiatric evidence (R. 52). However, no further psychiatric evidence was offered.

medications (R. 14). In fact, there were no medical records from Ms. Kladis's alleged onset date of July 11, 2003, through her last insured date of December 31, 2005, and state agency physicians agreed that there was insufficient evidence to establish the existence of a severe medically determinable impairment through December 2005 (R. 13, 15). Ms. Kladis did not seek medical treatment again until 2007, when she next visited Dr. Damergis and had certain tests done (R. 15).

The ALJ reviewed the medical notes from 2010, including Dr. Damergis's referral to a psychiatrist, normal testing and examination results, and Dr. Raslan's opinion that her symptoms were more suggestive of an anxiety disorder (R. 15). Though she finally consulted a mental health professional in December 2010, the ALJ noted that Ms. Kladis disagreed with both the diagnosis and treatment of her symptoms (*Id.*). The ALJ noted that Dr. McKenna also testified that Ms. Kladis's complaints appeared to stem from anxiety rather than exposure to chemicals (R. 13). The ALJ also considered Dr. Damergis's July 28, 2010 letter, but because it was written more than five years after her date last insured, he did not find the letter probative of Ms. Kladis's claim for disability.

Ultimately, the ALJ found it "noteworthy" that during the pertinent time period, Ms. Kladis did not follow up on recommendations from any of her physicians, including consulting with an occupational health physician or a mental health professional (R. 15). In addition, the ALJ explained that all diagnostic testing and examinations by Dr. Damergis, hospital physicians, and pulmonary specialists were completely normal, both before and after the date last insured (R. 16). Thus, the ALJ found that Ms. Kladis did not suffer from a medically determinable impairment and was not under a disability at any time from July 11, 2003, through December 31, 2005, her date last insured (*Id.*).

## II.

It is well-settled that we will uphold the ALJ's determination if it is supported by substantial evidence, and that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). "The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Here, the issue before the Court is whether the ALJ's Step Two determination that Ms. Kladis did not have a severe impairment is supported by substantial evidence. In her motion, Ms. Kladis argues that the ALJ erred because "[t]here is substantial evidence to support the fact that the claimant suffers from a medically determinable impairment – anxiety, and that she suffered from anxiety prior to her date last insured, and at the time of her alleged onset date" (doc. # 17: Pl.'s Mot. at 13). Furthermore, Ms. Kladis contends that this impairment is severe, as demonstrated by her physical symptoms when she is exposed to fumes and chemicals, including heart palpitations, diarrhea, nausea, vomiting, and shortness of breath (*Id.*).

At Step Two, a claimant must show that she suffered from a severe medically determinable physical or mental impairment beginning before her date last insured, which can be expected to result in death or last at least 12 months. 42 U.S.C. § 423(d); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). If a claimant does not make this showing, she must be found not disabled. 20 C.F.R. § 404.1520(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). Thus, to receive disability insurance benefits, Ms. Kladis must show, at the threshold, that she suffered from a severe impairment on or before her last insured date of December 31, 2005. *Pepper v. Colvin*, 712 F.3d 351, 354, (7th Cir. 2013).

"The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, even if the reason for the sparse record is simply a long lapse of time." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). "Though that, in itself, does not doom her application, the long lapse in time raises obvious evidentiary problems." *Id.* at 666.

Here, Ms. Kladis did not file her application for benefits until February 11, 2010, more than six years after her alleged onset date and more than four years after her date last insured. Ms. Kladis sought no medical treatment between the alleged onset date and date last insured. In the long lapse of time before she filed her application, she only sought treatment for a few months in 2007. Moreover, while the medical records from 2007 note that Ms. Kladis was experiencing stress or anxiety from life events, they do not offer a medical diagnosis of anxiety disorder or some other long term psychological impairment. Ms. Kladis's 2007 medical records also do not contain any complaints of physical symptoms from chemical exposure.

More than two years later, in February 2010, Ms. Kladis's application for benefits alleged that she suffered from physical impairments last recorded in medical reports in 2003, including "sensitivity to all kinds of chemicals," "heart races," "lose balance," "nausea," "diarrhea," "feel like fainting," "fatigue," and "breathing problems." These physical symptoms, however, do not add up to a disability. As Social Security Ruling 96-4p explains: "No symptom or combination of symptoms by itself can constitute a medically determinable impairment." SSR 96-4p. Moreover, in examinations conducted in June and July 2010, Dr. Raslan found that Ms. Kladis's test results (including for pulmonary function) were normal (R. 493, 495-98). At bottom, the record evidence fails to show that Ms. Kladis had a severe physical impairment even as late as 2010, much less as of the end of 2005.

Ms. Kladis's application for disability benefits did not ascribe her alleged disability to any mental impairment. Indeed, when she finally underwent a mental health evaluation in December 2010, she disagreed with the proffered diagnosis and the suggested treatment for her symptoms. However, in her motion for summary judgment, Ms. Kladis's attorney attempts to dispute Ms. Kladis's own contention that she is physically impaired due to chemical sensitivies. The motion relies on Dr. Damergis's June 2010 report diagnosing Ms. Kladis with "anxiety disorder" (R. 504), which, Ms. Kladis's motion contends, shows that Dr. Damergis "finally realized that the Plaintiff's problems were not physical, but were caused by her mental illness" (Pl.'s Mot. at 5, 8). Ms. Kladis's attorney then attempts to show that Ms. Kladis's alleged mental illness began as early as 1987, when Dr. Damergis noted that Ms. Kladis experienced stress over her son's tragic death, or in 2000, when Ms. Kladis was upset due to marital discord, and then reappeared in 2003 when medical reports indicated that she seemed very anxious (*Id*. at 6-7).

This argument is not grounded in the reality of the medical record or Ms. Kladis's own complaints. As the ALJ noted, there are no medical records between Ms. Kladis's alleged onset date of July 11, 2003, and almost two years after her date last insured. Ms. Kladis did not seek treatment again until several months after she filed her application for benefits, and she did not see a mental health professional until December 2010. Furthermore, a May 2010 consultative psychiatric review concluded that Ms. Kladis had no significant limitations in activities of daily living due to depression (R. 307). And, Ms. Kladis has steadfastly maintained that she has not suffered from a mental impairment, and she has refused medication.

While medical evidence from long before or long after the relevant time period may be probative of an impairment "if the claimant demonstrates that it has some relation back to the critical time period," *Thompson v. Colvin*, No. 12 C 585, 2013 WL 1718768, at *15 (N.D. Ill.

10

Apr. 18, 2013), Ms. Kladis has not made this showing here. As in *Thompson*, in this case the large gaps in time between Ms. Kladis's medical appointments during and surrounding the critical time period are insurmountable for Ms. Kladis. The scant record does not support an inference that the disabling anxiety that Dr. Damergis diagnosed in 2010 began in 1987, 2000, or even in 2003. In his July 28, 2010, letter opining that Ms. Kladis could not sustain gainful employment due to her impairments, Dr. Damergis did not offer a retrospective opinion about Ms. Kladis's impairments between the critical time period from July 2003 through December 2005 (R. 520).[3] Ms. Kladis's attorney is the only one who suggests that Ms. Kladis had a severe mental impairment dating back to the critical time period.

Thus, we find that the ALJ's decision to deny Ms. Kladis's claim was supported by substantial evidence. The ALJ properly evaluated Ms. Kladis's claims against the lack of medical evidence and treatment in the record and found that Ms. Kladis did not meet her burden to establish that she suffered from a severe medically determinable physical or mental impairment between her alleged onset date, July 11, 2003, and her date last insured, December 31, 2005. *See Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007).[4]

---

[3]Even if Dr. Damergis had opined in 2010 that Ms. Kladis's impairment had rendered her disabled between 2003 and 2005, it is "difficult to see" how that opinion would have been "grounded in the requisite legitimate medical basis," *Eichstadt*, 534 F.3d at 667, given his failure to diagnose Ms. Kladis with a mental impairment in his preceding 24 years of treating her. *See Guranovich v. Astrue*, No. 09 C 3167, 2011 WL 686358, at *21-22 (N.D. Ill. Feb. 25, 2011) (holding that, as in *Eichstadt*, a medical opinion years after the claimant's date last insured provided only conclusory support for the proposition that the impairment existed during the relevant time period where the disease did not have a "well-understood progression").

[4]At the end of her motion, Ms. Kladis states that "[e]stablishing the onset date is difficult in this case," but she has never attempted to change her alleged onset date of July 11, 2003, and Ms. Kladis does not put forth an alternative onset date now (Pl.'s Mot. at 14). Thus, Ms. Kladis's alleged onset date remains July 11, 2003.

## CONCLUSION

For the foregoing reasons, we deny the plaintiff's motion (doc. # 17) and affirm the Commissioner's decision. This case is terminated.

**ENTER:**

_/s/ Sidney I. Schenkier_
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: May 27, 2014**